IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RANDY JAY SMITH,

                 Plaintiff,                OPINION AND ORDER

    v.

                                      14-cv-226-wmc

NEIL JENSEN,

                 Defendant.

---

Plaintiff Randy Jay Smith is presently committed as a sexually violent person under Wis. Stat. ch. 980 to the Sand Ridge Secure Treatment Center in Mauston, Wisconsin. The court previously authorized Smith to proceed on claims that defendant Neil Jensen denied his rights to practice his religious beliefs in violation of the Free Exercise and Establishment Clauses of the First Amendment. (Dkt. #11.) Pending before the court are defendant's Motion for Summary Judgment (dkt. #25), which will be granted, and plaintiff's Motion for Appointment of Council (dkt. #42), which will be denied.

UNDISPUTED FACTS[1]

## I.    The Parties

At all times relevant to the complaint, Smith has been confined as a patient at the Sand Ridge Secure Treatment Center ("Sand Ridge"), where defendant Neil Jensen is employed by the Wisconsin Department of Health Services ("DHS") as a chaplain. Sand Ridge is a secure treatment facility operated by the DHS for persons who have been committed under Wisconsin's sexually violent persons law, Chapter 980. Sand Ridge's

---

[1] The following facts are material and undisputed, unless otherwise noted. The facts are drawn from the parties' proposed findings of fact and the underlying evidentiary support submitted at summary judgment.

mission is to enhance public safety by providing specialized mental health treatment, rehabilitation, training and supervision to patients housed there.

As chaplain, Jenson is charged with ensuring that patients have opportunities to participate in meaningful religious study groups and worship services.  To that end, he coordinates pastoral visits, talks to patients, responds to patient interview requests, schedules religious programming, approves religious diets and processes patient requests for religious property.  Jensen also oversees Sand Ridge's religious programs for Christian bible studies, the Buddhist group, the Wicca group, the Islamic group and the Jewish group.

## II.     Sand Ridge Computer Use Policies

Sand Ridge permits patients to access computers for learning and treatment activities. No personal computers are allowed, but patients may access Patient LAN (local area network) computers upon request.  When a patient's request for computer usage is approved, that patient is assigned an H-drive account to save documents.  The H-drives are monitored by Sand Ridge's IT staff.  This restriction applied equally to all patients.

The terms of patient computer use are laid out in Sand Ridge Policy and Procedure # SR 364.  Before April of 2013, SR 364 expressly permitted patients to save treatment, education and legal work to their H-drives, but did not address whether patients could save religious materials.

Sand Ridge's handbook further prohibits patients from communicating using unrecognizable languages, alphabets, symbols or codes.  The justification for this restriction is that any type of secret code or language poses a security concern because it prevents staff from reviewing and translating notes and correspondence to determine if a security concern exists.  Concerns include gang communications, an escape plan, inciting a riot, group

2

resistance or a plan to engage in injurious behavior towards oneself, another inmate or staff. Communications in code also prevent Sand Ridge staff from learning whether patients are communicating in counter-therapeutic ways, such as planning criminal activities.  In addition to using coded communications, unrestricted clip art is prohibited as an unauthorized communication, because certain pictures can trigger specific behaviors related to pedophilia, bestiality and other sexually-based crimes that can inhibit rehabilitation.

## III.     February 2013 Investigation and Policy Change

A February 2013 investigation showed that some patients were using the Patient LAN to access images, or "clip art," from unauthorized sources and computer applications in ways that were considered to be security risks, including:

- Some patients were saving these unauthorized images on institution computers in their H-drives.

- Some patients were using clip art as an unauthorized form of communication or code, and some were also writing journal entries related to clip art pictures of small children. Those journal entries were very graphic and considered counter-therapeutic.

- Patients created fictitious letterhead and certificates using clip art.  Examples of such inappropriate use involved a patient creating a fake marriage license and another creating a contract used for potential gang recruitment.

- One patient used clip art/symbols from the Patient LAN to make up his own language to communicate in code using symbols.  He claimed that this language was a part of his religious exercise.

This investigation caused Sand Ridge staff to delve into whether patients could even use the Patient LAN for religious purposes, given that SR 364 only expressly permitted computer use for treatment education and legal work.  Until SR 364 was revised to address these new security concerns, Sand Ridge's Security Director Steve Schneider decided that Patient LAN use for religious purposes should be very limited, and he directed all religious

groups to be temporarily prohibited from (1) using the computers to save religious documents and (2) using clip art.  Security Director Schneider advised Chaplain Jensen about the results of the investigation.

## IV.     The Restriction on Smith's Access to the H-drive

Smith practices the Wiccan religious faith and attends Wiccan services at Sand Ridge. For six years, Smith used the Patient LAN to access religious study programs and "clip art" related to his Wiccan faith.  In particular, Smith has used clip art of religious symbols in connection with his religious studies and Wiccan rituals.

On or around February 7, 2013, Schneider asked Jensen to inform the Wiccan group that computer use for religious purposes would be temporarily suspended until SR 364 could be clarified.  He also told Jensen to inform the Wiccan patients that accessing clip art through the institution's computer programs was no longer permitted.   Although the restriction applied to all patients, Jensen was assigned this task because he was the supervising chaplain for the Wiccan group and he knew that the Wiccan group would be affected by this change in policy based on that group's frequent computer use ostensibly for religious purposes.

During the Wiccan group meeting that day, Jensen told the group about Schneider's directive to limit computer use to treatment, legal and education work.  Jensen also told the group that patients were permitted to write religious documents long-hand or on typewriters, and that patients who were working on the current ritual could be permitted to continue to

save their work on the computers if they received Jensen's written permission.  Finally, Jensen told the group that clip art could not be accessed for religious purposes.[2]

Following that meeting, Smith told Jensen that he nevertheless planned to continue doing his religious work on the institution's computers because it was his right to do so. Security Director Schneider's restriction on patient computer use for religious purposes lasted from February 7 to April of 2013, when SR 364 was revised to expressly permit patients to save treatment, education, legal work and documents for a recognized religious group on the Patient LAN.

As for clip art, Sand Ridge's IT staff changed the security access so that patients could no longer access it.  This change applied to the entire Patient LAN and all patients.

On December 1, 2015, however, the Patient LAN started using a new program called "Open Office."  The Open Office program provides patients with limited, approved clip art, and it is available to all patients.

OPINION

Plaintiff Randy Smith claims that the Wiccan religious group was singled out for different treatment in violation of his First Amendment rights when the Patient LAN and clip art restrictions were imposed, and he seeks monetary damages for every day that he was denied the right to practice his religious beliefs.  Defendant argues that the undisputed facts establish that these restrictions did not violate either the Free Exercise or the Establishment Clause of the First Amendment, and that he is in any event entitled to qualified immunity.

---

[2] Although it does not appear Jensen stated this during the meeting, patients were also permitted to draw their own religious symbols, maintain these drawings in a Wiccan Book of Shadows or other permissible journal and possess, copy and/or trace religious art from approved religious publications.

After considering the parties' arguments, their proposed findings of fact and the record, the court agrees with defendant and will grant summary judgment in his favor. *See* Fed. R. Civ. P. 56(a).

## I.     Free Exercise Claim

Generally, when a prisoner brings a claim under the First Amendment, the question is whether the challenged restriction is reasonably related to a legitimate penological interest. *Turner v. Safely*, 482 U.S. 78 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).  Four factors are relevant to that determination:  (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right.  *Turner*, 482 U.S. at 89-91.

In the context of claims brought under the Free Exercise Clause, however, there may be other questions as well.  In particular, it is not clear whether a plaintiff must prove that: the defendants placed a "substantial burden" on his exercise of religion; or the restriction is not a neutral rule of general applicability, but instead targets the plaintiff's religion for adverse treatment.  In some cases, courts have considered one or both of these other elements, and in some cases, courts have omitted considering either.  *E.g.*, *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) (applying *Turner* standard without discussing other elements); *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (requiring prison to show that restriction was discriminatory); *Kaufman v. McCaughtry*, 419 F.3d 678, 682-83 (7th Cir. 2005) (requiring showing of substantial burden).  *See also Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013) (stating that it is open question whether prisoner must prove

discrimination in free exercise claim); *World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 534 (7th Cir. 2009) (plaintiff may prove free exercise claim with evidence of substantial burden *or* intentional religious discrimination).

Whether or not either additional requirement is applicable here, judgment for defendant is appropriate. Taking up the latter two categories first below, it is plain the plaintiff cannot prove them on this record. Even if he could, Smith falls short under the four *Turner* factors as well.

### A.     Substantial Burden

The undisputed facts certainly do not support that the Patient LAN and clip art restrictions substantially burdened plaintiff's ability to practice his Wiccan faith. "Whether the government has imposed a substantial burden on [ ] religious exercise is a legal determination." *Grace Sch. v. Burwell*, 801 F.3d 788, 804 (7th Cir. 2015). The United States Supreme Court has defined "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available. *Holt v. Hobbs,* 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2775 (2014)). The use of the term "seriously" provides little more guidance than "substantial burden," but the Seventh Circuit advises it means more than just a "modest" violation. *Schlemm v. Wall,* 784 F.3d 362, 365 (7th Cir. 2015).

The Supreme Court has further clarified that the religious exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Still, plaintiff must show at least: (1) a loss of benefits, or (2) that the prison applied pressure to modify behavior. *Koger v. Bryan,* 523 F.3d 789, 799 (7th Cir. 2008) (holding that government

conduct is substantially burdensome when it "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs") (internal citations and quotation marks omitted).

While plaintiff explains how he used the Patient LAN and clip art previously for religious purposes, he submits *no* evidence that the inability to use the Patient LAN or clip art caused him to violate his Wiccan faith.  Far from it, Smith simply states that starting in February 2009, he was able to use his assigned H drive to produce religious materials for studying Wiccan religious presentations and religious outlines for scripts of rituals.  Then, he claims, the February 2013 prohibition on the use of the H drive for religious purposes made it more difficult for him to prepare his outlines for rituals, and that the clip art restriction had the same effect.  Yet plaintiff's complaints of inconvenience caused by the February 2013 restrictions establish neither a *substantial* burden on his religious practices, nor that he was pressured to violate his Wiccan beliefs in any way or otherwise act in a way that was at odds with his beliefs.

As plaintiff acknowledges, he was still permitted to write, draw, copy or trace his own religious symbols and artwork.  Although he claims that this method of creating his religious materials required him to ask Jensen to authorize and copy his materials, plaintiff does not explain why or how this change violates his Wiccan beliefs.  On the contrary, he does not even suggest that the Wiccan faith requires computer-generated materials or specific images available only via clip art, nor could he given the relatively recent advent of this source of information.

Given that plaintiff acknowledges hand-written materials are acceptable forms of religious materials, it appears that his only complaint is one of inconvenience.  As he has not

suggested that this inconvenience makes it impracticable for him to create the necessary Wiccan materials, he has not submitted evidence that the restrictions on the use of the Patient LAN and clip art substantially burdened his religious beliefs.   Accordingly, defendant's request for summary judgment on this issue is appropriate.

### B.   Intentional Religious Discrimination

The same is true if plaintiff must prove intentional discrimination.   Here, Smith asserts that the Patient LAN and clip art restrictions intentionally singled out the Wiccan group, but provides no evidence in support.   The closest thing to proof is Jensen's admission that of those religious groups in his charge, he only met with the Wiccan group about the restrictions because the Wiccan group would be more affected than other groups as the only group that used the Patient LAN to prepare religious materials.   (Jensen Aff., dkt. #30, ¶ 11.) Regardless, plaintiff submitted no facts to dispute defendant's assertion that the restrictions applied equally to all patients, as well as all religious groups.   Accordingly, the undisputed facts have not established that the restrictions were the product of intentional discrimination.

### C.   *Turner* Factors

Even if this court were to conclude that plaintiff submitted sufficient evidence of restrictions on computer use substantially burdened his religious practice or were intentionally discriminatory, summary judgment would still be appropriate on plaintiff's Free Exercise claim.   In the prison context, a regulation that impinges on an inmate's constitutional rights, such as one imposing a "substantial burden" on free exercise, may be justified if it is "reasonably related to legitimate penological interests." *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).   Further, the

Seventh Circuit advises that "facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high." *Thielman v. Leean*, 282 F.3d 478, 483 (7th Cir. 2002). As a result, courts must show deference to the judgment exercised by the professionals in these facilities, which includes security personnel. *Id.*; *Tainter v. State of Wisconsin Dep't of Health and Family Servs.*, No 02-C-540-C, 2003 WL 23200348, at *6 (W.D. Wis. Aug. 5, 2003).

Here, the restrictions on computer use and access to clip art appear justified in light of the circumstances, or at least a reasonable jury would have to find on this record. As to the first *Turner* factor, there is a rational relationship between the restrictions on computer use and clip art and a legitimate penological interest. There is no dispute that Sand Ridge has a legitimate interest maintaining a safe, secure, rehabilitative and therapeutic environment for its patients. *See State v. Carpenter*, 197 Wis. 2d 252, 271, 541 N.W.2d 105, 112 (Wis. 1995) ("We conclude that the principal purposes of ch. 980 are the protection of the public and the treatment of convicted sex offenders who are at a high risk to reoffend in order to reduce the likelihood that they will engage in such conduct in the future."). Defendant thus contends that when patients are able to communicate in code and use clip art, those goals are compromised. To establish the link between the computer restrictions and Sand Ridge's goals of promoting safety, rehabilitation and therapy, defendant submitted two affidavits of Sand Ridge employees. *See Brown v. Philips*, 801 F.3d 849, 854 (7th Cir. 2015) (requiring the state to "present some evidence to show that the restriction is justified" when demonstrating a rational relationship between a policy and its stated goals) (citation omitted).

Sandra Kracht, a Teacher Supervisor at Sand Ridge, averred to the validity of both restrictions. (Kracht Aff., dkt. #28.) She states that her duties include supervising the

institution teachers, chaplains and the library, as well as overseeing the patient computer labs.  Kracht acknowledges that the February 2013 investigation created concern that SR 364 actually prohibited patients from using the Patient LAN to access, create and save religious materials.  Indeed, she was involved in revising SR 364 to expressly allow patients to save religious documents as long as they were not counter-therapeutic or threatened institution safety or security, noting that it was nevertheless necessary for Sand Ridge to take time to investigate whether that change would be appropriate.

Kracht also averred that the results of the February 2013 investigation led to the restrictions because the investigation showed that patients *were* using the clip art in counter-therapeutic ways.  In particular, Kracht described an instance where a Sand Ridge patient improperly communicated in code using symbols, which was both counter-therapeutic and created a security risk, since Sand Ridge employees were unable to evaluate whether the communications were plans to engage in criminal behavior.

Defendant also submitted the affidavit of Nickolas Baldwin, the Supervising Officer at Sand Ridge responsible for the administration and security functions of the institution. (Baldwin Aff., dkt. #29.)  Like Kracht, Baldwin averred that any type of secret code or language used by patients at Sand Ridge poses a legitimate concern because it prevents staff from reviewing inmates notes and correspondence to determine if either a security risk exists or patients are communicating in counter-therapeutic ways, such as planning a crime.  Officer Baldwin similarly averred that when the February 2013 investigation revealed inmates were using the Patient LAN to access clip art from unauthorized sources and saving them to their H-drives -- and that some of those images were graphic and others were used to create fake marriage licenses and a contract for gang recruitment -- Sand Ridge felt the need to take

corrective action.  According to Baldwin, therefore, Sand Ridge staff decided to disable unauthorized access to clip art both to avoid patient access to more images that posed security risks and a potential impediment to patient therapy.

If nothing else, these affidavits establish that the temporary restrictions on Patient LAN use and clip art was rationally related to Sand Ridge's interests in security, rehabilitation and therapy.  As to the Patient LAN use restriction, Kracht's affidavit suggests that the unrevised version of SR 364 actually prohibited use of the Patient LAN for religious purposes, and that a patient who claimed to be saving religious materials was actually saving improper clip art to his Patient LAN, creating a security risk and exhibiting counter-therapeutic behavior in the process.  Thus, Sand Ridge acted reasonably in attempting to curb improper Patient LAN use under the guise of religious use by prohibiting patients from using the Patient LAN for any purpose until the revision to SR 364 took effect.  Further, both affidavits linked specific, improper uses of the clip art saved to the Patient LAN to security risks and counter-therapeutic behavior.  Accordingly, the first *Turner* factor supports defendant's position that the restrictions further legitimate penological interests.

As to the second *Turner* factor, the undisputed facts establish that Sand Ridge patients, including plaintiff, had alternative means of accessing, creating and maintaining religious materials at Sand Ridge.  Namely, plaintiff was permitted to possess and create, by hand or other non-computerized means, religious materials.  For instance, he could use a typewriter or draw religious art.  Plaintiff does not suggest that these alternatives were insufficient, beyond being more laborious, and so this factor weighs in favor of the defendant's position as well.

The same is true as to the third *Turner* factor -- whether the absence of the restrictions

12

would have had an adverse effect on Sand Ridge's operations.  As explained above, Sand Ridge staff learned about both counter-therapeutic use of clip art saved on the Patient LAN, as well as coded communications that created security risks.  Thus, if Sand Ridge did not attempt to curb this behavior, the problems would have persisted.  Again, this factor favors defendant's position.

Finally, the fourth *Turner* factor asks whether Sand Ridge had an obvious, easy alternative method to accomplish its legitimate interests.  Unsurprisingly, plaintiff suggests that the restriction was unnecessary because *he* had never used clip art or the Patient LAN inappropriately.  Yet plaintiff's response does not take into account the fact that the restrictions apply to all patients, in an effort to address specific problems at Sand Ridge.  Nor does his response offer any other alternatives.  Moreover, the Patient LAN and clip art restrictions were temporary, Sand Ridge permitted patients to create religious materials in other ways between February and April 2013, and Sand Ridge actually allowed on-going projects to continue if the patients received permission.

Giving deference to the judgment of Sand Ridge staff, *see Thielman*, 282 F.3d at 483, the court agrees that there were no other obvious, alternative ways in which Sand Ridge could attempt to maintain security and avoid counter-therapeutic behavior by its patients.  As each of the four *Turner* factors support the temporary Patient LAN and clip art restrictions, plaintiff's Free Exercise claim fails.

## II.     Establishment Clause

The Establishment Clause "prohibits the government from favoring one religion over another without a legitimate secular reason." *Kaufman v. McCaughtry,* 419 F.3d 678, 683 (7th Cir. 2005).  However, a legitimate secular reason for any difference in treatment is fatal

to an Establishment Clause claim. *Id.* at 683.

Plaintiff's *only* argument in support of his Establishment Clause claim is his repeated assertion that Jensen singled out the Wiccan group with respect to the computer use and clip art restrictions, but he submitted nothing beyond his own statements in support. As credibly explained, the only reason Jensen informed the Wiccan group about the restriction is that Sand Ridge staff knew that the Wiccan group would be more affected than other groups because that group was the only one he knew that used the Patient LAN to prepare religious materials. (Jensen Aff., dkt. #30, ¶ 11.) Plaintiff thus submitted no factual support for his belief that Jensen sought to treat the Wiccan religious group worse than other groups. *See Hearn v. Kennell,* 433 Fed. Appx. 483, 484 (7th Cir. 2011) ("summary judgment was proper because [plaintiff] put forth no evidence that the prison's decision to serve kosher meal but not halal meal was motivated by intentional or purposeful discrimination"). Nor does plaintiff contest defendant's position that the computer use and clip art restrictions applied to *all* patients at Sand Ridge, not just religious patients, or more specifically Wiccan patients, a position buttressed by the fact that Jensen enforced the restriction on a Jewish patient. (Jensen Aff., dkt. #30, ¶ 11.) Accordingly, defendant's request for summary judgment on plaintiff's Establishment Clause claim will be granted.

## III.    Qualified Immunity

Finally, defendants have asserted qualified immunity, which shields them from liability for monetary damages "when their actions do not violate clearly established constitutional or statutory rights."[3] *Turner v. Hamblin*, 590 F. Appx. 616, 619 (7th Cir.

---

[3] Defendant also contends that he is entitled to summary judgment because he was not personally involved in imposing the restrictions, citing to the rule in *Burks v. Raemisch*, 555

14

2014); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted) (alteration in original). Courts are required to define the clearly established right at issue based on the specific context of the case. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). However, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* They must likewise be sure to draw all inferences in favor of the non-movant. *Id.*

Here, plaintiff is seeking monetary damages for each day in which the temporary restrictions were in place. Yet plaintiff acknowledges there are no decisions directly establishing that the restrictions at issue violated his rights under either the Free Exercise of Establishment Clauses. Accordingly, plaintiff has no clearly established First Amendment right to have unfettered use of computers and clip art in order to exercise his religion while incarcerated, and defendant is entitled to qualified immunity.

### III.    Motion for Assistance in Recruiting Council (dkt. #42)

After the parties' summary judgment briefing had been completed, plaintiff filed a renewed Motion for Assistance in Recruiting Council, which had previously been denied because plaintiff did not demonstrate that he had made reasonable efforts to find a lawyer on

---

F.3d 592, 596 (7th Cir. 2009), that a public official who simply knows about a wrong is not liable for not fixing it. Defendant's reliance on *Burk* is unpersuasive because it did not involve a defendant, such as Jensen, who had the authority to *enforce* the rule, but apparently not the authority to *create* the rule. In that case, Burk named several WDOC officials as defendants, the majority of whom were not involved in the facts comprising his complaint. *Id.* at 594-95. In contrast, the undisputed facts establish that Jensen had a markedly more active role with the other key actors here than did the defendants in *Burk*. Accordingly, defendant has not established that he is entitled to summary judgment on this ground.

his own.  Although this motion is moot now that the court is granting defendant's motion for summary judgment, even construing this as a request for counsel for purposes of re-briefing the defendant's motion for summary judgment, it must be denied.

Before a district court can consider this motion, it must first find that the plaintiff has made reasonable efforts to find a lawyer on his own and that they were unsuccessful or that he was prevented from making such efforts.  *Jackson v. County of McLean*, 953 F.2d 1070 (7th Cir. 1992).  To prove that he has made reasonable efforts to find a lawyer, as plaintiff was advised, he must submit letters from at least three lawyers who he asked to represent him in this case and who turned him down, or if such letters exist, an affidavit with the names, addresses and dates when he requested assistance.  Plaintiff has now submitted letters from two attorneys, which the court will consider sufficient to meet this requirement.

The next question is whether litigating this case is beyond plaintiff's capabilities.  *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (en banc) (the central question in deciding whether to request counsel for an indigent civil litigant is "whether the difficulty of the case – factually and legally – exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself"). Plaintiff claims that this case is too complex for him to handle on his own, but the facts of this lawsuit are relatively straightforward and also largely undisputed.  Indeed, this case boiled down to whether the defendant's justification for the computer policies were permissible under current law, which the court felt capable of determining without recruiting counsel for plaintiff.

Further, plaintiff's filings indicate that he is quite capable of handling this lawsuit. His filings have been neatly typed and organized, and he appears to understand the Federal Rules of Civil Procedure.  Additionally, with respect to the summary judgment motion, he

responded to defendant's proposed finding of facts and brief in the proper manner, objecting to some of defendant's facts and arguing his belief that the Wiccan group was singled out. Nothwithstanding that he did not ultimately succeed, plaintiff has proven himself capable of handling this matter without the assistance of counsel.

ORDER

IT IS ORDERED that defendant Neil Jensen's Motion for Summary Judgment (dkt. #25) is GRANTED, and plaintiff's Motion for Appointment of Council (dkt. #42) is DENIED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 27th day of June, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge